FILED

JUL 1 8 2016

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* JOHN POLANCO, <br><br> Plaintiff-Relator, <br><br> v. <br><br> PHAMATECH, INC.; and TUAN PHAM, <br><br> Defendants. | IN CAMERA AND UNDER SEAL <br><br> JURY TRIAL DEMANDED <br><br> CASE NUMBER: _____ <br><br> 16 CV 1835  L  NLS |

## COMPLAINT FOR FALSE CLAIMS ACT VIOLAITONS
## UNDER 31 U.S.C. § 3729, ET SEQ.

1.     This is an action brought on behalf of the United States of America by John Polanco, by and through his attorneys, against Phamatech, Inc., and Tuan Pham, an individual, pursuant to the *qui tam* provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.* (the "FCA").

### I.

### Preliminary Statement

2.     This suit seeks to recover millions of dollars in taxpayer money illegally obtained by an independent clinical laboratory, Phamatech, Inc. ("Phamatech"), and its owner and Chief Executive Officer, Tuan Pham ("Mr. Pham") (collectively "Defendants"), through the perpetration of two separate schemes.   Through the execution of these schemes, Defendants submitted extensive false claims under the FCA.

///

3.     The first scheme involved an orchestrated effort to defraud the federal Medicare and Medicaid programs (hereinafter the "Government Programs") out of funds paid for the testing of urine samples. This scheme had two components.

4.     First, in order to secure large volumes of samples for testing in its laboratories, Defendants paid kickbacks to referral sources. The recipients of these kickbacks included marketing companies, purported marketing companies that were actually owned by doctors, clinics and other laboratories (collectively "Health Care Providers"), and Health Care Providers directly through receipt of free products, namely specimen cups. The samples provided as a result of these kickbacks were tested by Phamatech and billed to the Government Programs. This conduct constitutes a clear violation of the Anti-Kickback Statute (the "AKS") and similar schemes have been prosecuted successfully by the United States Department of Justice under the FCA.

5.     Second, in addition to securing samples through improper referrals, Defendants tested samples that they knew were not medically necessary and billed Government Programs for reimbursement. Each claim submitted for reimbursement for such testing constituted a separate violation of the FCA.

6.     The second scheme involved the submission by Defendants of false claims related to a large forensic testing contract with the United States. Specifically, in or around 2004, Phamatech bid on and obtained a contract with the General Services Administration ("GSA") for the forensic testing of urine samples for inmates housed in the federal Bureau of Prisons. In order to obtain, keep, and renew this contract, Phamatech certified, among other things, that it would only provide products approved by the Food and Drug Administration ("FDA"). It also certified that it would provide the GSA with "most favored customer" pricing – or the lowest price available for services and products covered by the contract.

7.     However, Phamatech did neither. It sold cups to GSA that were not approved by the FDA and charged non-government customers less, or in some

instances nothing at all, for comparable services and products, namely specimen cups. When audited, Phamatech, at the direction of Mr. Pham, selectively chose which invoices to provide to auditors in order to hide this fraud. Accordingly, not only should Phamatech never have received the forensic testing contract with the United States, but each claim submitted in violation of Phamatech's certifications violated the FCA.

8.    In sum, Defendants billed Government Programs for the testing of samples secured through improper kickbacks, that it knew were not medically necessary, or that violated the terms of its contract with the United States. Each such claim constituted a separate violation of the FCA. Such claims for reimbursement allowed Defendants to exponentially grow its profits at the expense of the American taxpayer.

9.    Defendants should be held to account for their fraudulent conduct at the monies paid to Defendants under these illegal schemes returned to the United States.

## II.

## Jurisdiction and Venue

10.    This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1345.

11.    This Court has personal jurisdiction over Phamatech because, among other things, it transacts business in this District, and engaged in wrongdoing in this District. Specifically, Phamatech entered into fraudulent kickback arrangements in this District, tested fraudulently obtained and medically unnecessary samples in this District, and violated the terms of its forensic testing contract with the United States in this District.

12.    Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c). Phamatech transacts business within this District, Mr.

Pham resides in this District, and the acts proscribed by 31 U.S.C. § 3729 occurred in this District.

## III.

## Parties

13.     Plaintiff-Relator John Polanco ("Relator") works as a Vice President of Sales for Phamatech. He brings this action on behalf of itself, the United States pursuant to 31 U.S.C. § 3730(b)(1), and the *qui tam* provisions of the FCA.

14.     Relator joined Phamatech, Inc., in 2001, after successfully starting and growing his own company that specialized in providing urine specimen testing for government agencies.  In around 2006, Relator received a promotion, after which he oversaw the main portion of the company's laboratory testing business. Around this time, the company also went through a major shift, starting to perform a large amount of "clinical" or medical testing rather than simply "forensic" testing for government agencies.

15.     Currently, Relator remains the Vice President of Sales.  However, he has raised concerns about the company's practice of paying "per sample" referral fees and paying large amounts to marketing companies, some of which appear to be simply fronts for large clinics run by doctors.  He has also expressed concern about the forensic testing contract with the United States and the company's failure to comply with the pricing requirements of that contract.  As a result, Mr. Pham has taken many of Mr. Polanco's duties from him and reduced his salary by half.

16.     Defendant Phamatech, Inc. is a California corporation with its principal place of business in San Diego, California.  Phamatech sells medical diagnostic devices and also provides laboratory testing services.  Phamatech employees hundreds of people and enjoys average annual revenues in the $30-50 million range.  In recent years, Phamatech has significantly expanded its testing of specimens funded by Government Programs, and in particular Medicare.

4

17.     Defendant Tuan Pham Mr. Pham is an individual who resides in San Diego, California.  He is the Chief Executive Officer of Phamatech and exercises exclusive control over all of the company's operations.

## IV.

## Applicable Statutes

### A.     The Anti-Kickback Statute

18.     The AKS makes it illegal for individuals or entities to offer or pay any remuneration (including any kickback, bribe, or rebate) to any person to induce such person to purchase, order, or recommend purchasing or ordering, "any good . . .or item for which payment may be made in whole or in part under a Federal health care program."  42 U.S.C. § 1320a-7b(b)(2).

19.     The AKS has been interpreted to cover any arrangement where one purpose of the remuneration is to obtain the referral of services to be billed to any Government Program.    Thus, a laboratory violates the AKS when it pays fees directly to Health Care Providers, or to marketers that work with Health Care Providers, in order to secure the referral of specimens for testing that will be billed to Government Programs.    Moreover, HHS-OIG has made clear that such payments do not fall under the "safe harbor" provisions of 42 C.F.R. § 1001.952 because such payments are often on a "per sample basis" and/or they are not set in advance and consistent with fair market value in an arm's length transaction.

### B.     The False Claims Act

20.     The FCA is the Federal government's chief weapon in combating waste, fraud, and abuse of public funds.  In relevant part, the FCA provides for treble damages and civil penalties for any entity which:

   (i)     "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," *see* 31 U.S.C. § 3729(a)(1) (2000) and, as amended, 31 U.S.C. § 3729(a)(1)(A);

(ii)   "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* at § 3729(a)(1)(B); or

(iii)   "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid," *id.* at § 3729(a)(3) (1986), and, as amended, 31 U.S.C. § 3729(a)(1)(C).

21.   An entity "knowingly" presents a false statement where it "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." Unlike other fraud statutes, the FCA does not require proof of a specific intent to defraud. *See* 31 U.S.C. § 3729(b)(1).

22.   The FCA provides that a person "may bring a civil action for a violation of section 3729 for the person and for the United States Government." 31 U.S.C. §3730(b)(1).

23.   In March 2010, Congress codified existing case law by directing that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g).

## V.

## The Government Programs

**A.   Medicare and Medicaid**

24.   The Medicare program was established in 1965 as a medical insurance program for persons age 65 or older, persons under age 65 with certain disabilities, and persons of any age with end-stage renal disease. The United States Department of Health and Human Services administers the Medicare program through a contract with the Centers for Medicare and Medicaid Services.

25.   Medicare now covers approximately 47.5 million Americans and accounts for approximately 16 percent of the federal budget.   The program is

funded through payroll taxes paid by workers and their employers, as well as monthly premiums that are deducted from Social Security checks.

26.     The Medicare program consists of four parts: Parts A, B, C, and D. Part B provides for reimbursement on a fee-for-service basis for physician services associated with independent clinical lab testing and the services performed by the actual labs.

27.     Medicaid is a joint federal-state program created in 1965 that provides health care benefits for certain groups, primarily the poor and disabled. The federal government pays a portion of each state's Medicaid payments. The amount paid by the federal government is known as the Federal Medical Assistance Percentage ("FMAP") and is based on the state's per capita income compared to the national average. *See* 42 U.S.C. § 1396d(b). FMAP is at least 50 percent and can be as high as 83 percent.

**B.     Certifications to the Government Programs**

28.     In order to participate in the Medicare and Medicaid programs, a provider, including a laboratory that conducts testing of specimens, like Phamatech, must complete an application and be approved for such participation. As part of the application process, providers, including Phamatech, each provide the following certification:

> I agree to abide by the Medicare Laws, regulations, and program instructions that apply to this supplier. The Medicare laws, regulations and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's

compliance with all applicable conditions of participation in Medicare....

..I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*See* CMS, Form CMS 855B.

29.     Those who wish to participate in Medicaid programs must complete a similar certification.

30.     Phamatech made these certifications to the Medicare and Medicaid programs at the time of its initial application to become a provider and regularly must recertify this information as a condition of continued participation.

**C.     Government Program Reimbursement for Laboratory Testing**

31.     Government Programs only cover tests that are reasonable and necessary for the treatment or diagnosis of an individual patient's illness or injury. This assessment stems from such individual's medical condition. *See* 42 U.S.C. § 1395y(a)(1)(A). More specifically, the need for each test for each patient must be individually assessed and documented in the patient's medical chart. *See* 42 C.F.R. §§ 410.32(a) & (d)(2).

**VI.**

**The Kickback Scheme**

32.     Defendants engaged in a "kickback scheme" that had two components. First, it paid improper referral fees to secure urine samples for testing, both through actual cash payments and the provision of free urine testing cups. Second, it conducted testing of urine samples that it knew was not medically necessary and then billed the Government Programs for such testing.

///

///

## A.     Payment of Illegal Referral Fees

33.    Defendants paid improper referral fees in two separate ways — direct payments and free specimen cups.

### 1.     Direct Payments

34.    Phamatech, at the direction of Mr. Pham, entered into contracts with purported marketing companies and Health Care Providers whereby it paid such companies a per-sample fee for referrals of samples that were billed to Government Programs.

35.    Some of the contracts expressly provided that fees would be paid on all samples, whether billed to Medicare/Medicaid or private insurance.  Other contracts contained provisions indicating that they did *not* apply to samples billed to Government Programs.  Despite this language, however, Phamatech routinely either paid those companies a per-sample fee for the referral of Medicare/Medicaid samples anyway, or it adjusted the "per sample" rate for non-Medicare/Medicaid samples to make up for the referral of Medicare/Medicaid samples.

### 2.     Free Specimen Cups

36.    In addition to direct payments, Phamatech also paid illegal referral fees in the form of providing Health Care Providers with free products, specifically testing cups.  Giving doctors free cups constitutes an illegal incentive for them to send samples, as it is akin to charging them the normal price for the cups but then paying them a "refund" when the samples are sent.

37.    For example, records reflect that on November 18, 2013, Phamatech "sold" Doctor M.D. "12-Test Drug Cups" (which are identical to the 10 Panel Instant Cup sold to GSA) for a unit price of "$0.00," or free of charge.  Similarly, on June 10, 2014, November 24, 2014, February 17, 2015, and July 21, 2015, Phamatech provided Doctor V.V. hundreds of the same cups, via separate orders, free of charge.  Phamatech also gave free and significantly reduced cups to Doctor

J.M., as reflected in invoices dated April 3, 2014, April 9, 2014, and November 16, 2015.

**B.    Conducting Testing That Was Not Medically Necessary**

38.    In addition to paying illegal referral fees for samples, Phamatech billed Government Programs for the testing of samples that it knew was not medically necessary.

39.    For example, Phamatech entered into a verbal agreement with Imperial Valley Wellness ("IVW"), a Health Care Provider posing as its own marketing company, to pay per-sample fees for all samples sent to Phamatech for testing.  IVW then began sending a significant number of samples to Phamatech for testing.  Many of the samples sent over by IVW and the requested testing were not medically necessary.

40.    Phamatech knew they were not medically necessary because the requisition forms for all of the requested testing were all identical in nearly every respect except patient name.    Specifically, all of the requisition forms each requested that Phamatech perform every single possible test, regardless of the age, history, or specific medical needs of that particular patient.    This allowed Phamatech to request the highest reimbursement possible from the Government Programs and violated numerous federal rules and regulations.  *See, e.g.,* 42 U.S.C. § 1395y(a)(1)(A) (providing that Medicare only covers tests that are reasonable and necessary for the treatment or diagnosis of an individual patient's illness or injury); 42 C.F.R. §§ 410.32(a) & (d)(2) (requiring that the need for each test for each patient be individually assessed and documented in the patient's medical chart).

41.    In addition, for many of the patients, IVW sent samples for testing the same person's urine multiple times, in rapid succession, over numerous billing cycles, by different doctors from the same facility.  In many cases, the urine specimens were significantly diluted, suggesting that one urine sample had been

used to create multiple specimens for testing. Nonetheless, Phamatech tested those numerous samples for the same patient on multiple occasions and billed such testing to Government Programs.

42. By way of example, the below chart summarizes the testing of samples on numerous dates with respect to four separate patients that Phamatech billed to Government Programs:

| Date | Patient F.F. | Patient O.A. | Patient F.H. | Patient A.H. |
|---|---|---|---|---|
| May 23 | X | X | X | |
| May 24 | X | | | X |
| May 27 | X | | X | X |
| May 28 | | | | X |
| May 29 | | | | X |
| May 30 | | | X | X |
| | | | | |
| June 2 | | X | | |
| June 3 | | X | | |
| June 4 | X | X | X | |
| June 5 | X | X | X | X |
| June 6 | | X | X | X |
| June 9 | X | X | | X |
| | | | | |
| June 10 | X | X | | X |
| June 11 | X | X | | |
| June 12 | | X | | |
| June 13 | | X | | |
| | | | | |
| Totals | 8 | 11 | 7 | 9 |

43. As indicated in the above chart, one patient, O.A., actually had his urine tested 11 times by Phamatech in less than one month – all of which billed to Government Programs.

## VII.

### False Claims Relating to the GSA Contract

44.    In addition to its illegal kickback scheme, Phamatech submitted numerous claims in violation of the FCA in connection with its testing contract with the GSA.

45.    In or around 2004, Phamatech secured a contract with the GSA to perform forensic testing on urine samples for inmates in the custody of the United States Bureau of Prisons.  That contract was renewed several times and remains in effect to this day.

46.    As a requirement of this contract, Phamatech certified and agreed that it would provide the GSA with "Most Favorite Customer" ("MFC") pricing.  This meant that Phamatech could not charge any other customer a lower price for the same products or services it provided to the GSA under this contract.

47.    However, Phamatech did just that.  For example, part of the contract required that Phamatech sell GSA 25,000 urinalysis "cups" every month for the "instant" testing of inmates.  Phamatech assured GSA that it was giving them the best pricing on those cups.  Specifically, the "Authorized Federal Supply Schedule Price List" for the most recent contract period, dating from June 1, 2014 through May 31, 2019, lists a price of $5.92 for a "10 Panel Instant Cup Test."

48.    Phamatech, however, routinely gave other doctors and providers better pricing on those cups, including by way of "2 for 1" discounts and other incentives, or even gave away cups free of charge.

49.    For example, as indicated above, records reflect that on November 18, 2013, Phamatech "sold" Doctor M.D. "12-Test Drug Cups" (which are identical to the 10 Panel Instant Cup sold to GSA) for a unit price of "$0.00," or free of charge.  Similarly, on June 10, 2014, November 24, 2014, February 17, 2015, and July 21, 2015, Phamatech provided Doctor V.V. hundreds of the same cups, via separate orders, free of charge.  Phamatech also gave free and

significantly reduced cups ($2.67) to Doctor J.M., as reflected in invoices dated April 3, 2014, April 9, 2014, and November 16, 2015.

50.    Finally, approximately two months before this filing, Phamatech actually gave a lower price to the Department of Corrections for the State of Pennsylvania – $2.65 – then it did to the GSA, as confirmed by an Invoice dated May 17, 2016.

51.    To make matters worse, when the yearly audit would come up with GSA, Phamatech, at the direction of Mr. Pham, would misrepresent its compliance with the MFC pricing requirement.  In particular, when the GSA officials would ask for invoices showing pricing to other customers, Phamatech purposely provided only invoices showing higher prices, despite knowing that it was actually giving lower prices to other doctors or providers.  Phamatech did so because it knew that failure to comply with the requirements of the contract would result in cancellation of the contract per its terms and likely fines.

52.    In addition to the MFC pricing requirement, Phamatech also agreed in the contract to comply with all federal regulations relating to the contract, including those of the Food and Drug Administration ("FDA").  However, Phamatech routinely sold specimen cups and related products to GSA that were not cleared or approved by the FDA.

53.    Each claim submitted for reimbursement under the GSA contract in contravention of the MFC pricing requirement, and each claim related to specimen cups sold to the GSA that were not cleared by the FDA, constituted separate false claims under the FCA.

## VIII.

## Damages

54.    As indicated above, Phamatech paid improper referral fees in violation of the AKS and then submitted claims for reimbursement related to the samples obtained by such referral fees.  It also billed Government Programs for

testing that it knew was not medically necessary. Finally, it submitted claims in violation of its certification to provide the GSA with MFC pricing and to provide goods that complied with FDA requirements. Each and every claim under each of the categories above constituted a false claim, in violation of the FCA.

55.     Upon information and belief, Phamatech entered into contracts with dozens of marketing companies to secure improper referrals of samples that were then billed to Government programs.

56.     Upon information and belief, Phamatech billed Government Programs for thousands of tests that were not medically necessary.

57.     Upon information and belief, Phamatech submitted numerous claims in connection with its contract with the GSA for payment on terms that did not constitute MFC pricing and/or that were for products not cleared by the FDA.

58.     Each one of those claims was false within the meaning of the FCA.

59.     Defendants therefore have submitted thousands, and possibly hundreds of thousands, or false claims to the Government Programs and are liable to the United States of America for millions of dollars in damages.

## IX.

## Causes of Action

### COUNT ONE

### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1))

60.     Relator hereby incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

61.     Defendants knowingly presented and caused to be presented to the United States of America false or fraudulent claims for payment in violation of 31 U.S.C. § 3729(a)(1).

62.     Relator cannot at this time identify each and every such false claim, because there are thousands, and possibly hundreds of thousands, of such claims that were presented by Defendants over an extended period of time, and Relator

has no control over Defendants and insufficient access to the records in Defendants' possession that would reveal such information.

63. By reason of the false and fraudulent claims submitted by Defendants, the United States of America has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each claim.

## COUNT TWO
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2)

64. Relator hereby incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

65. Defendants knowingly made, used, or caused to be made or used, false or fraudulent records or statements material to the payment of false or fraudulent claims, thereby causing false or fraudulent claims for payment to actually be made or approved, in violation of 31 U.S.C. § 3729(a)(2).

66. Specifically, Defendants regularly certified that Phamatech was in compliance with the AKS and terms of its contract with the GSA when it was not. These false and fraudulent statements caused the United States of America to pay out sums that it would not have had it known that the statements were false.

67. Relator cannot at this time identify each and every such false statement, because there are thousands, and possibly hundreds of thousands, of such statements that were presented by Defendants over an extended period of time, and Relator has no control over Defendants and insufficient access to the records in Defendants' possession that would reveal such information.

68. By reason of the false and fraudulent statements made by Defendants, the United States of America has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each statement.

///

## X.

### Prayer for Relief

69.     For the foregoing reasons, Relator respectfully requests that judgment be entered in favor of the United States of America and against Defendants for treble the damages to the United States, in an amount to be determined at trial, the maximum statutory penalty for each false claim submitted in violation of the FCA, an award of costs, and any other relief the Court deems proper.

## XI.

### Jury Trial Demanded

70.     Relator respectfully demands a trial by jury of all issues so triable.


DATED: July 18, 2016                     Respectfully submitted,


                                         ARENDSEN CANE MOLNAR LLP

                                         HAMILTON E. ARENDSEN
                                         California Bar Number: 212844
                                         550 West C Street, Suite 1150
                                         San Diego, California 92101
                                         Telephone:  (619) 535-3910
                                         Email:      harendsen@arendsenlaw.com

                                         ATTORNEYS FOR RELATOR