1  ARENDSEN CANE MOLNAR LLP
   Hamilton E. Arendsen
2  California Bar Number: 212844
   550 West C Street, Suite 1150
3  San Diego, California 92101
   Telephone:  (619) 535-3910
4  Fax:         (619) 535-3920
   Email:       harendsen@arendsenlaw.com
5
   THE HANRAHAHN FIRM
6  Corey P. Hanrahan
   California Bar Number: 256835
7  402 West Broadway, Suite 1760
   San Diego, California 92101
8  Tel:         (619) 377-6522
   E-fax:       (619) 377-6662
9  Email:       corey@hanrahanfirm.com

10 ATTORNEYS FOR RELATOR

11            UNITED STATES DISTRICT COURT

12       FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13
   UNITED STATES OF AMERICA, *ex rel.*  )
14 JOHN POLANCO,                        )   16-CV-1835-L (NLS)
                                        )
15        Plaintiff-Relator,            )   FIRST AMENDED COMPLAINT
                                        )
16 v.                                   )   **[UNDER SEAL]**
                                        )
17                                      )   JURY TRIAL DEMANDED
                                        )
18 PHAMATECH, INC.; and TUAN PHAM,      )
                                        )
19        Defendants.                   )
                                        )

20            **FIRST AMENDED COMPLAINT FOR**

21            **FALSE CLAIMS ACT VIOLATIONS**

22  **UNDER 31 U.S.C. § 3729, ET SEQ. AND EMPLOYMENT CLAIMS**

23        1.    This is an action brought on behalf of the United States of America

24 by John Polanco, by and through his attorneys, against Phamatech, Inc., and Tuan

25 Pham, an individual, pursuant to the *qui tam* provisions of the Federal Civil False

26

27

28                              1

FILED

OCT 1  2019

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Claims Act, 31 U.S.C. § 3729, *et seq.* (the "FCA"). Mr. Polanco also advances employment claims against Phamatech.

# I.

## Preliminary Statement

2.     This suit seeks to recover millions of dollars in taxpayer money illegally obtained by an independent clinical laboratory, Phamatech, Inc. ("Phamatech"), and its owner and Chief Executive Officer, Tuan Pham ("Mr. Pham") (collectively "Defendants"), through the perpetration of two separate schemes.     Through the execution of these schemes, Defendants submitted extensive false claims under the FCA.

3.     The first scheme involved an orchestrated effort to defraud the federal Medicare and Medicaid programs (hereinafter the "Government Programs") out of funds paid for the testing of urine samples. This scheme had two components.

4.     First, in order to secure large volumes of samples for testing in its laboratories, Defendants paid kickbacks to referral sources.  The recipients of these kickbacks included marketing companies, purported marketing companies that were actually owned by doctors, clinics and other laboratories (collectively "Health Care Providers"), and Health Care Providers directly through receipt of free products, namely specimen cups.  The samples provided as a result of these kickbacks were tested by Phamatech and billed to the Government Programs. This conduct constitutes a clear violation of the Anti-Kickback Statute (the "AKS") and similar schemes have been prosecuted successfully by the United States Department of Justice under the FCA.

5.     Second, in addition to securing samples through improper referrals, Defendants tested samples that they knew were not medically necessary and billed Government Programs for reimbursement.     Each claim submitted for reimbursement for such testing constituted a separate violation of the FCA.

6.      The second scheme involved the submission by Defendants of false claims related to a large forensic testing contract with the United States. Specifically, in or around 2004, Phamatech bid on and obtained a contract with the General Services Administration ("GSA") for the forensic testing of urine samples for inmates housed in the federal Bureau of Prisons.  In order to obtain, keep, and renew this contract, Phamatech certified, among other things, that it would only provide products approved by the Food and Drug Administration ("FDA").  It also certified that it would provide the GSA with "most favored customer" pricing – or the lowest price available for services and products covered by the contract.

7.      However, Phamatech did neither.  It sold cups to GSA that were not approved by the FDA and charged non-government customers less, or in some instances nothing at all, for comparable services and products, namely specimen cups.  When audited, Phamatech, at the direction of Mr. Pham, selectively chose which invoices to provide to auditors in order to hide this fraud.  Accordingly, not only should Phamatech never have received the forensic testing contract with the United States, but each claim submitted in violation of Phamatech's certifications violated the FCA.

8.      In sum, Defendants billed Government Programs for the testing of samples secured through improper kickbacks, that it knew were not medically necessary, or that violated the terms of its contract with the United States.  Each such claim constituted a separate violation of the FCA.   Such claims for reimbursement allowed Defendants to exponentially grow its profits at the expense of the American taxpayer.

9.      Defendants should be held to account for their fraudulent conduct at the monies paid to Defendants under these illegal schemes returned to the United States.

10.      In addition, Mr. Polanco seeks to recover damages from Phamatech for its unlawful employment practices, including retaliation against Mr. Polanco

for his complaints of illegal and improper conduct at Phamatech, age discrimination, and intentional infliction of emotional distress.

11.    The tortious acts and omissions alleged herein were performed by management level employees of Defendants. Defendants allowed and/or condoned a continuing pattern of discriminatory practices.

12.    Plaintiff filed his charge with the California Department of Fair Employment and Housing ("DFEH") on February 23, 2018, and thereafter on that same day received from the DFEH his "right to sue."

## II.

### Jurisdiction and Venue

13.    This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1345.

14.    Plaintiff requests the Court to exercise supplemental jurisdiction over Plaintiff's California causes of action for age discrimination brought pursuant to California Labor Code § 12940(a), pursuant to 28 U.S.C. § 1367. The Court's exercise of supplemental jurisdiction would serve the interests of judicial economy as the State claims are parallel in fact and in law to the federal claims.

15.    This Court has personal jurisdiction over Phamatech because, among other things, it transacts business in this District, and engaged in wrongdoing in this District.    Specifically, Phamatech entered into fraudulent kickback arrangements in this District, tested fraudulently obtained and medically unnecessary samples in this District, violated the terms of its forensic testing contract with the United States in this District, and made its improper employment decisions and actions in this District.

16.    Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c). Phamatech transacts business within this District, Mr. Pham resides in this District, and the acts proscribed by 31 U.S.C. § 3729 occurred in this District.

# III.

## Parties

17.     Plaintiff-Relator John Polanco ("Relator") worked as a Vice President of Sales for Phamatech. He brings this action on behalf of itself, the United States pursuant to 31 U.S.C. § 3730(b)(1), and the *qui tam* provisions of the FCA. He also advances employment claims.

18.     Defendant Phamatech, Inc. is a California corporation with its principal place of business in San Diego, California. Phamatech sells medical diagnostic devices and also provides laboratory testing services. Phamatech employees hundreds of people and enjoys average annual revenues in the $30-50 million range. In recent years, Phamatech has significantly expanded its testing of specimens funded by Government Programs, and in particular Medicare

19.     Relator joined Phamatech, Inc., in 2001, after successfully starting and growing his own company that specialized in providing urine specimen testing for government agencies. In around 2007, Relator received a promotion to National Sales Director, after which he oversaw the main portion of the company's laboratory testing business. Around this time, the company also went through a major shift, starting to perform a large amount of "clinical" or medical testing rather than simply "forensic" testing for government agencies. In or around 2012, Relator became Vice President, Direction of National Sales and Operations.

20.     Defendant Tuan Pham Mr. Pham is an individual who resides in San Diego, California. He is the Chief Executive Officer of Phamatech and exercises exclusive control over all of the company's operations.

///

///

///

///

## IV.

## Applicable Qui Tam Statutes

### A.   The Anti-Kickback Statute

21.    The AKS makes it illegal for individuals or entities to offer or pay any remuneration (including any kickback, bribe, or rebate) to any person to induce such person to purchase, order, or recommend purchasing or ordering, "any good . . .or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2).

22.    The AKS has been interpreted to cover any arrangement where one purpose of the remuneration is to obtain the referral of services to be billed to any Government Program.    Thus, a laboratory violates the AKS when it pays fees directly to Health Care Providers, or to marketers that work with Health Care Providers, in order to secure the referral of specimens for testing that will be billed to Government Programs.    Moreover, HHS-OIG has made clear that such payments do not fall under the "safe harbor" provisions of 42 C.F.R. § 1001.952 because such payments are often on a "per sample basis" and/or they are not set in advance and consistent with fair market value in an arm's length transaction.

### B.   The False Claims Act

23.    The FCA is the Federal government's chief weapon in combating waste, fraud, and abuse of public funds.  In relevant part, the FCA provides for treble damages and civil penalties for any entity which:

(i)    "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," *see* 31 U.S.C. § 3729(a)(1) (2000) and, as amended, 31 U.S.C. § 3729(a)(1)(A);

(ii)    "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* at § 3729(a)(1)(B); or

(iii)   "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid," *id.* at § 3729(a)(3) (1986), and, as amended, 31 U.S.C. § 3729(a)(1)(C).

24.   An entity "knowingly" presents a false statement where it "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." Unlike other fraud statutes, the FCA does not require proof of a specific intent to defraud. *See* 31 U.S.C. § 3729(b)(1).

25.   The FCA provides that a person "may bring a civil action for a violation of section 3729 for the person and for the United States Government." 31 U.S.C. §3730(b)(1).

26.   In March 2010, Congress codified existing case law by directing that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g).

## V.

## The Government Programs

### A.   Medicare and Medicaid

27.   The Medicare program was established in 1965 as a medical insurance program for persons age 65 or older, persons under age 65 with certain disabilities, and persons of any age with end-stage renal disease. The United States Department of Health and Human Services administers the Medicare program through a contract with the Centers for Medicare and Medicaid Services.

28.   Medicare now covers approximately 47.5 million Americans and accounts for approximately 16 percent of the federal budget. The program is funded through payroll taxes paid by workers and their employers, as well as monthly premiums that are deducted from Social Security checks.

29.     The Medicare program consists of four parts: Parts A, B, C, and D. Part B provides for reimbursement on a fee-for-service basis for physician services associated with independent clinical lab testing and the services performed by the actual labs.

30.     Medicaid is a joint federal-state program created in 1965 that provides health care benefits for certain groups, primarily the poor and disabled. The federal government pays a portion of each state's Medicaid payments. The amount paid by the federal government is known as the Federal Medical Assistance Percentage ("FMAP") and is based on the state's per capita income compared to the national average. *See* 42 U.S.C. § 1396d(b).  FMAP is at least 50 percent and can be as high as 83 percent.

**B.      Certifications to the Government Programs**

31.     In order to participate in the Medicare and Medicaid programs, a provider, including a laboratory that conducts testing of specimens, like Phamatech, must complete an application and be approved for such participation. As part of the application process, providers, including Phamatech, each provide the following certification:

> I agree to abide by the Medicare Laws, regulations, and program instructions that apply to this supplier. The Medicare laws, regulations and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare....

..I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*See* CMS, Form CMS 855B.

32.     Those who wish to participate in Medicaid programs must complete a similar certification.

33.     Phamatech made these certifications to the Medicare and Medicaid programs at the time of its initial application to become a provider and regularly must recertify this information as a condition of continued participation.

**C.     Government Program Reimbursement for Laboratory Testing**

34.     Government Programs only cover tests that are reasonable and necessary for the treatment or diagnosis of an individual patient's illness or injury. This assessment stems from such individual's medical condition. *See* 42 U.S.C. § 1395y(a)(1)(A).  More specifically, the need for each test for each patient must be individually assessed and documented in the patient's medical chart.  *See* 42 C.F.R. §§ 410.32(a) & (d)(2).

**VI.**

**The Kickback Scheme**

35.     Defendants engaged in a "kickback scheme" that had two components.  First, it paid improper referral fees to secure urine samples for testing, both through actual cash payments and the provision of free urine testing cups.   Second, it conducted testing of urine samples that it knew was not medically necessary and then billed the Government Programs for such testing.

**A.     Payment of Illegal Referral Fees**

36.     Defendants paid improper referral fees in two separate ways – direct payments and free specimen cups.

///

## Direct Payments

37.     Phamatech, at the direction of Mr. Pham, entered into contracts with purported marketing companies and Health Care Providers whereby it paid such companies a per-sample fee for referrals of samples that were billed to Government Programs.

38.     Some of the contracts expressly provided that fees would be paid on all samples, whether billed to Medicare/Medicaid or private insurance.   Other contracts contained provisions indicating that they did *not* apply to samples billed to Government Programs.  Despite this language, however, Phamatech routinely either paid those companies a per-sample fee for the referral of Medicare/Medicaid samples anyway, or it adjusted the "per sample" rate for non-Medicare/Medicaid samples to make up for the referral of Medicare/Medicaid samples.

## Free Specimen Cups

39.     In addition to direct payments, Phamatech also paid illegal referral fees in the form of providing Health Care Providers with free products, specifically testing cups.  Giving doctors free cups constitutes an illegal incentive for them to send samples, as it is akin to charging them the normal price for the cups but then paying them a "refund" when the samples are sent.

40.     For example, records reflect that on November 18, 2013, Phamatech "sold" Doctor M.D. "12-Test Drug Cups" (which are identical to the 10 Panel Instant Cup sold to GSA) for a unit price of "$0.00," or free of charge.  Similarly, on June 10, 2014, November 24, 2014, February 17, 2015, and July 21, 2015, Phamatech provided Doctor V.V. hundreds of the same cups, via separate orders, free of charge.  Phamatech also gave free and significantly reduced cups to Doctor J.M., as reflected in invoices dated April 3, 2014, April 9, 2014, and November 16, 2015.

///

## B.   Conducting Testing That Was Not Medically Necessary

41.   In addition to paying illegal referral fees for samples, Phamatech billed Government Programs for the testing of samples that it knew was not medically necessary.

42.   For example, Phamatech entered into a verbal agreement with Imperial Valley Wellness ("IVW"), a Health Care Provider posing as its own marketing company, to pay per-sample fees for all samples sent to Phamatech for testing.  IVW then began sending a significant number of samples to Phamatech for testing.  Many of the samples sent over by IVW and the requested testing were not medically necessary.

43.   Phamatech knew they were not medically necessary because the requisition forms for all of the requested testing were all identical in nearly every respect except patient name.   Specifically, all of the requisition forms each requested that Phamatech perform every single possible test, regardless of the age, history, or specific medical needs of that particular patient.   This allowed Phamatech to request the highest reimbursement possible from the Government Programs and violated numerous federal rules and regulations.   *See, e.g.,* 42 U.S.C. § 1395y(a)(1)(A) (providing that Medicare only covers tests that are reasonable and necessary for the treatment or diagnosis of an individual patient's illness or injury); 42 C.F.R. §§ 410.32(a) & (d)(2) (requiring that the need for each test for each patient be individually assessed and documented in the patient's medical chart).

44.   In addition, for many of the patients, IVW sent samples for testing the same person's urine multiple times, in rapid succession, over numerous billing cycles, by different doctors from the same facility.   In many cases, the urine specimens were significantly diluted, suggesting that one urine sample had been used to create multiple specimens for testing.   Nonetheless, Phamatech tested

those numerous samples for the same patient on multiple occasions and billed such testing to Government Programs.

45.    By way of example, the below chart summarizes the testing of samples on numerous dates with respect to four separate patients that Phamatech billed to Government Programs:

| Date | Patient F.F. | Patient O.A. | Patient F.H. | Patient A.H. |
|------|------|------|------|------|
| May 23 | X | X | X | |
| May 24 | X | | | X |
| May 27 | X | | X | X |
| May 28 | | | | X |
| May 29 | | | | X |
| May30 | | | X | X |
| | | | | |
| June 2 | | X | | |
| June 3 | | X | | |
| June 4 | X | X | X | |
| June 5 | X | X | X | X |
| June 6 | | X | X | X |
| June 9 | X | X | | X |
| | | | | |
| June 10 | X | X | X | X |
| June 11 | X | X | | |
| June 12 | | X | | |
| June 13 | | X | | |
| | | | | |
| Totals | 8 | 11 | 7 | 9 |

46.    As indicated in the above chart, one patient, O.A., actually had his urine tested 11 times by Phamatech in less than one month – all of which billed to Government Programs.

///

# VII.

## False Claims Relating to the GSA Contract

47.     In addition to its illegal kickback scheme, Phamatech submitted numerous claims in violation of the FCA in connection with its testing contract with the GSA.

48.     In or around 2004, Phamatech secured a contract with the GSA to perform forensic testing on urine samples for inmates in the custody of the United States Bureau of Prisons.  That contract was renewed several times and remains in effect to this day.

49.     As a requirement of this contract, Phamatech certified and agreed that it would provide the GSA with "Most Favorite Customer" ("MFC") pricing.  This meant that Phamatech could not charge any other customer a lower price for the same products or services it provided to the GSA under this contract.

50.     However, Phamatech did just that.  For example, part of the contract required that Phamatech sell GSA 25,000 urinalysis "cups" every month for the "instant" testing of inmates.  Phamatech assured GSA that it was giving them the best pricing on those cups.  Specifically, the "Authorized Federal Supply Schedule Price List" for the most recent contract period, dating from June 1, 2014 through May 31, 2019, lists a price of $5.92 for a "10 Panel Instant Cup Test."

51.     Phamatech, however, routinely gave other doctors and providers better pricing on those cups, including by way of "2 for 1" discounts and other incentives, or even gave away cups free of charge.

52.     For example, as indicated above, records reflect that on November 18, 2013, Phamatech "sold" Doctor M.D. "12-Test Drug Cups" (which are identical to the 10 Panel Instant Cup sold to GSA) for a unit price of "$0.00," or free of charge.  Similarly, on June 10, 2014, November 24, 2014, February 17, 2015, and July 21, 2015, Phamatech provided Doctor V.V. hundreds of the same cups, via separate orders, free of charge.  Phamatech also gave free and

significantly reduced cups ($2.67) to Doctor J.M., as reflected in invoices dated April 3, 2014, April 9, 2014, and November 16, 2015.

53.     Finally, approximately two months before this filing, Phamatech actually gave a lower price to the Department of Corrections for the State of Pennsylvania – $2.65 – then it did to the GSA, as confirmed by an Invoice dated May 17, 2016.

54.     To make matters worse, when the yearly audit would come up with GSA, Phamatech, at the direction of Mr. Pham, would misrepresent its compliance with the MFC pricing requirement.  In particular, when the GSA officials would ask for invoices showing pricing to other customers, Phamatech purposely provided only invoices showing higher prices, despite knowing that it was actually giving lower prices to other doctors or providers.  Phamatech did so because it knew that failure to comply with the requirements of the contract would result in cancellation of the contract per its terms and likely fines.

55.     In addition to the MFC pricing requirement, Phamatech also agreed in the contract to comply with all federal regulations relating to the contract, including those of the Food and Drug Administration ("FDA").  However, Phamatech routinely sold specimen cups and related products to GSA that were not cleared or approved by the FDA.

56.     Each claim submitted for reimbursement under the GSA contract in contravention of the MFC pricing requirement, and each claim related to specimen cups sold to the GSA that were not cleared by the FDA, constituted separate false claims under the FCA.

## VIII.

### Damages For False Claims

57.     As indicated above, Phamatech paid improper referral fees in violation of the AKS and then submitted claims for reimbursement related to the samples obtained by such referral fees.  It also billed Government Programs for

testing that it knew was not medically necessary. Finally, it submitted claims in violation of its certification to provide the GSA with MFC pricing and to provide goods that complied with FDA requirements. Each and every claim under each of the categories above constituted a false claim, in violation of the FCA.

58. Upon information and belief, Phamatech entered into contracts with dozens of marketing companies to secure improper referrals of samples that were then billed to Government programs.

59. Upon information and belief, Phamatech billed Government Programs for thousands of tests that were not medically necessary.

60. Upon information and belief, Phamatech submitted numerous claims in connection with its contract with the GSA for payment on terms that did not constitute MFC pricing and/or that were for products not cleared by the FDA.

61. Each one of those claims was false within the meaning of the FCA.

62. Defendants therefore have submitted thousands, and possibly hundreds of thousands, or false claims to the Government Programs and are liable to the United States of America for millions of dollars in damages.

## IX.

## Factual Allegations Concerning Employment Claims

63. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

64. Plaintiff began his employment with Defendant in or around October 2001, in the capacity of Regional Sales Manager. Therefore, Defendant promoted Plaintiff to the position of National Sales Director in or around December 2007, and ultimately to Vice President, Director of National Sales and Operations in or around December 2012.

65. Defendant Phamatech holds itself out to the public as, "a global manufacturer of rapid diagnostic devices and provider of laboratory testing for medication monitoring, illicit drugs, alcohol, and now Pharmacogenetic testing."

Defendant Phamatech has two main divisions, Forensic and Clinical. The Forensic division involves drug testing for private workplaces, as well as probation departments for local, county, state and federal government. Through its Forensic division, Defendant Phamatech also sells Food and Drug Administration approved Point of Care Testing (POCT) devices. The Clinical division involves drug testing at the clinical setting (i.e. doctor's offices, clinics, hospitals, etc.). Clinical Laboratory Improvement Amendment (CLIA) waived POCT devices are also sold through Defendant Phamatech's Clinical division.

66.   As noted above, during Plaintiff's employment, Defendant Phamatech engaged in unlawful and fraudulent "pass-through billing," as well as conduct that violated the Federal anti-kickback statute. Pass-through billing occurs when an ordering provider requests and bills for a service while the actual services are not performed by the ordering physician. Rather, another entity (often a commercial laboratory like Defendant Phamatech) performs the test, invoices the physician (or sometimes third-party marketing group), and forwards the results so that the ordering physician can bill the payor and earn a profit on the transaction. As opposed to medical groups, marketing groups provide no medical value and simply reap the benefits of illegal pass-through billing. Often, third-party marketing groups become involved in order to further the scheme. This scheme involves laboratory services (like Defendant Phamatech) providing below market charges for the pass-through billing of patients covered by private and commercial insurance, in return for the steering of Medicare patients to the laboratory service.

67.   Defendant Phamatech and a marketing group, Providica Medical LLC ("Providica") entered into an agreement on or about February 7, 2012. This agreement provided for Providica to pay Defendant Phamatech $100 per sample sent to Defendant Phamatech from Providica, for individuals with private insurance. This per sample fee charged by Defendant Phamatech was far less than Defendant Phamatech charged for federally funded payors. In return, Providica

billed the private and commercial insurance companies at a much higher rate, sometimes in excess of 2000% more, for Defendant Phamatech's testing of the samples. This is illegal pass-through billing, since, under the law, Providica was disallowed to bill for services that it did not render (since Defendant Phamatech was testing the samples). Thereafter, in or around November 2013, Phamatech and Providica entered into a new agreement whereby Defendant Phamatech began paying Providica $235 per sample, and Defendant Phamatech began billing private and commercial insurance companies directly. At that point, the $235 per sample fee that Defendant Phamatech was paying Providica became the basis for Providica continuing to steer Medicare patients to Defendant Phamatech. Defendant Phamatech profited from this unlawful agreement by more than $5 million. However, this was not the only illegal agreement that Defendant Phamatech had with Providica.

68. Defendant Phamatech was complicit, and a co-conspirator, in the unlawful pass-through billing scheme because, as a benefit, Providica was unlawfully steering all its Medicare referrals to Defendant Phamatech. This "steering" of Medicare referrals was an unlawful benefit, or kickback, of the initial fraudulent pass-through billing scheme; it was, in and of itself, illegal. Plaintiff believes that Defendant Phamatech generated more than $1.5 million from Providica's unlawful steering of Medicare referrals.

69. Plaintiff also believes that Defendant Phamatech and Tuan Pham, Defendant Phamatech's owner, fraudulently underrepresented the scope of business performed with Providica (by way of samples processed) to the State of New York Department of Health. Defendant Phamatech processed over 100,000 samples from the State of New York, but Plaintiff believes Defendant Phamatech fraudulently represented to the State of New York that it processed approximately 200 samples. This false representation was done for the purpose of avoiding a larger monetary fine. Defendant Phamatech's false representation to the State of

New York will be confirmed by Plaintiff through subpoenaing information directly from the State of New York Department of Health.

70.    The unlawful arrangement between Defendant Phamatech and Providica also provided for horribly unlawful medical billing practices (mainly, unlawful billing for Medicare). By way of example, Providica's forms were created in a way to allow Defendant Phamatech to benefit from what's known as "bundling." In short, Defendant Phamatech was, oftentimes, paid per drug screened for a specific sample. Providica's form required the medical providers to select a "profile," as opposed to single drugs. This meant, then, that Defendant Phamatech would inflate the number of drugs screened for, so that it could bill a much higher rate for screening samples (since the cost was not drastically increased when testing for multiple drugs).

71.    During Plaintiff's employment, he was also the main contact for another marketing group with which Defendant Phamatech worked, Imperial Valley Wellness. Defendant Phamatech and Imperial Valley Wellness began their relationship in or around March 2015, at which point Imperial Valley Wellness began sending tens of thousands of samples (in excess of 24,000) to Defendant Phamatech. In return, Defendant Phamatech was paying Imperial Valley Wellness for the samples (initially by way of paying Imperial Valley Wellness' employees hourly wages, and then paying upwards of $50 per sample). These samples sent from Imperial Valley Wellness to Defendant Phamatech included Medicare patients, which meant that Defendant Phamatech billed, and received remuneration from, the Federal Government through Medicare for testing of these samples. Plaintiff regularly interacted and met with Socorro Escalante who had always held herself out as Imperial Valley Wellness' owner. However, during a meeting with Ms. Escalante in or around July 2015, she disclosed to Plaintiff that she was not Imperial Valley Wellness' owner, and that the owner was actually Dr. Luyen V. Pham. Plaintiff understood that Dr. Pham could not legally be Imperial

Valley Wellness' owner, though, because it resulted in him personally receiving illegal kick backs from Defendant Phamatech for steering patients, especially Medicare patients, to Defendant Phamatech.

72. Following his meeting with Ms. Escalante, Plaintiff immediately reported the information to Tuan Pham, since the information he received from Ms. Escalante showed that Defendant Phamatech had been receiving illegal payments from Medicare (as well as private insurance companies). In response, Tuan Pham responded, "Okay, let me deal with that." Plaintiff understood that, pursuant to Federal Law, Defendant Phamatech (and Tuan Pham) had 60 days in which to report and repay any illegal monies received for processing samples from Imperial Valley Wellness. To date, Plaintiff does not believe Defendant Phamatech (or Tuan Pham) reported and/or returned any monies improperly received. Plaintiff believes that Defendant Phamatech made more than $1.5 million from this illegal scheme with Imperial Valley Wellness.

73. Thereafter, Plaintiff reported the same information to Defendant Phamatech's Clinical Account Manager Jenny Ziolkowski, who was in charge of the Imperial Valley Wellness account. Plaintiff told Ms. Ziolkowski that what she was doing was "illegal." In response, Ms. Ziolkowski went directly to Tuan Pham's office. Shortly thereafter, in or around August 2015, Defendant Phamatech removed Plaintiff from the clinical component of his job and ceased sending him any billing documents (which was previously part of Plaintiff's job responsibilities, and directly within his purview).

74. Thereafter, in or around March 2016, Defendant Phamatech, through Tuan Pham, appointed Defendant Phamatech's corporate attorney, Bruce Glasser, as its Compliance Officer. Around that same time, Tuan Pham set up training by an entity out of New York, called Health Law Partners. It seemed strange to Plaintiff that Tuan Pham chose an entity out of New York, when there were plenty of qualified organizations in California. However, during the training session,

Plaintiff realized why Tuan Pham chose the organization. The only question Tuan Pham asked during the training seminar was, "If they're kickbacks, is there a dollar limit where they leave you alone?" In response, the trainer said, "No, it's still a kickback." This caused Plaintiff to realize that Tuan Pham was concerned about his (and Defendant Phamatech's) unlawful scheme with Providica, which was based out of New York (which was the basis for selecting a New York entity to conduct the training).

75.     Thereafter, Plaintiff received a telephone call from RKM Group, a marketing group that Defendant Phamatech began working with in or around 2011, priori to Plaintiff becoming Vice President, Director of National Sales and Operations. The individual from RKM Group asked Plaintiff if Defendant Phamatech, "allowed pass-through billing." Plaintiff did not know what pass-through billing was at the time, so he told the individual he would speak with Tuan Pham and get back to him. Thereafter, Plaintiff asked Tuan Pham if Defendant Phamatech allowed pass-through billing, and he said, "No[.]" As Plaintiff was leaving Tuan Pham's office, Tuan Pham stopped him and said, "the other marketing groups are an exception." This was a direct reference to Providica, and other marketing groups. At this point, Plaintiff became concerned about Defendant Phamatech's practices, and himself began to look into the illegalities of Defendant Phamatech's and Tuan Pham's actions.

76.     Thereafter, in or around April 2016, Plaintiff had another meeting with Ms. Escalante. In this meeting, and through paperwork Plaintiff received regarding Defendant Phamatech's business with Imperial Valley Wellness, Plaintiff learned that the number of samples Defendant Phamatech was receiving from Imperial Valley Wellness had significantly increased (Defendant Phamatech had received approximately 5,000 samples that previous month) since his July 2015 conversation with Tuan Pham. Thereafter, Plaintiff immediately reported to Mr. Glasser that Defendant was receiving more illegal samples, meaning more

illegal funds from Medicare, since he previously advised Defendant Phamatech and Tuan Pham that Dr. Pham was the owner of Imperial Valley Wellness. Plaintiff told Mr. Glasser, "We need to look at this closer." In response, Mr. Glaser exclaimed, "John [Plaintiff] do you want to go to jail?" Plaintiff responded, "If anyone is going to jail, it's going to be Tuan [Pham]." Mr. Glasser immediately walked away from Plaintiff and informed Tuan Pham about what Plaintiff had just said.

77.    Thereafter, Defendant Phamatech began reducing Plaintiff's salary drastically, to the point where his salary was decreased to 80%, and his commissions were completely removed by February 2017. Thereafter, Defendant (following attempts to coerce Plaintiff to resign his employment) terminated Plaintiff's employment effective March 6, 2017.

78.    Also, during Plaintiff's employment, Defendant Phamatech, by and through Tuan Pham, began engaging in conduct that Plaintiff felt were directed at him on the basis of his age, which equated to age discrimination by Defendant Phamatech.

## X.

## Causes of Action

### COUNT ONE – ALL DEFENDANTS

### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1))

79.    Relator hereby incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

80.    Defendants knowingly presented and caused to be presented to the United States of America false or fraudulent claims for payment in violation of 31 U.S.C. § 3729(a)(1).

81.    Relator cannot at this time identify each and every such false claim, because there are thousands, and possibly hundreds of thousands, of such claims that were presented by Defendants over an extended period of time, and Relator

has no control over Defendants and insufficient access to the records in Defendants' possession that would reveal such information.

82. By reason of the false and fraudulent claims submitted by Defendants, the United States of America has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each claim.

## COUNT TWO – ALL DEFENDANTS

### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2))

83. Relator hereby incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

84. Defendants knowingly made, used, or caused to be made or used, false or fraudulent records or statements material to the payment of false or fraudulent claims, thereby causing false or fraudulent claims for payment to actually be made or approved, in violation of 31 U.S.C. § 3729(a)(2).

85. Specifically, Defendants regularly certified that Phamatech was in compliance with the AKS and terms of its contract with the GSA when it was not. These false and fraudulent statements caused the United States of America to pay out sums that it would not have had it known that the statements were false.

86. Relator cannot at this time identify each and every such false statement, because there are thousands, and possibly hundreds of thousands, of such statements that were presented by Defendants over an extended period of time, and Relator has no control over Defendants and insufficient access to the records in Defendants' possession that would reveal such information.

87. By reason of the false and fraudulent statements made by Defendants, the United States of America has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each statement.

///

## COUNT THREE - PHAMATECH

### (Whistleblower Retaliation, 31 U.S.C.A. § 3730, et seq.)

88.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

89.     Defendants terminated Plaintiff's employment.

90.     Plaintiff reported to one or more of Defendant's agents, who had authority over him, who also had authority to investigate, discover or correct the violation, that he had reasonable cause to believe that Defendant was in violation of 31 U.S.C.A. § 3729, by presenting a false claim for money to the United States Government.

91.     Plaintiff believes and thereon alleges that his complaint, as stated herein, was a substantial motivating reason behind Defendant's decision to reduce his pay, remove his job responsibilities, and terminate his employment.

92.     As a direct, foreseeable, and proximate result of Defendant's conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and Plaintiff has suffered other economic losses in an amount to be determined at trial. Plaintiff has sought to mitigate these damages.

93.     As a direct, foreseeable, and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to his damages to in a sum to be established according to proof.

94.     As a result of Defendant's deliberate, outrageous, despicable conduct, Plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with Defendant's wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

95.   In addition to such other damages as may properly be recovered herein, Plaintiff is entitled to recover prevailing party attorneys' fees and costs pursuant to 31 U.S.C.A. § 3730(h).

### COUNT FOUR - PHAMATECH
### (Age Discrimination, Cal. Gov't Code § 12940(a))

96.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

97.   Plaintiff was older than 40 years old.

100.   Defendant, by and through its employees and agents, engaged in conduct that, taken as a whole, materially and adversely affected the terms and conditions of Plaintiff's employment, as stated herein, including but not limited to terminating Plaintiff's employment.

101.   Plaintiff believes and thereon alleges that his age was a substantial motivating reason for Defendant engaging in conduct that, when taken as a whole, materially and adversely affected the terms, conditions and privileged of Plaintiff's employment.

102.   As a direct, foreseeable, and proximate result of Defendant's conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and Plaintiff has suffered other economic losses in an amount to be determined at trial. Plaintiff has sought to mitigate these damages.

103.   As a direct, foreseeable, and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to his damages to in a sum to be established according to proof.

104.   As a result of Defendant's deliberate, outrageous, despicable conduct, Plaintiff is entitled to recover punitive and exemplary damages in an amount

commensurate with each of Defendant's wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

105.  In addition to such other damages as may properly be recovered herein, Plaintiff is entitled to recover prevailing party attorneys' fees and costs pursuant to Government Code § 12965(b).

## COUNT FIVE - PHAMATECH

### (Intentional Infliction of Emotional Distress)

106.  Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

107.  Defendant's intentional conduct, as stated herein, was outrageous and done for the purpose of causing Plaintiff to suffer humiliation, mental anguish and emotional and physical distress.

108.  Defendant intended to cause Plaintiff to suffer emotional distress or acted with reckless disregard of the probability that Plaintiff would suffer emotional distress, knowing that Plaintiff was present when the conduct occurred.

109.  As a further direct, foreseeable, and proximate result of Defendant's conduct, Plaintiff has sustained and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to Plaintiff's damage in an amount according to proof at trial.

110.  As a result of Defendant's deliberate, outrageous, despicable conduct, Plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with each of Defendant's wrongful acts and sufficient to punish and deter future similar reprehensible conduct

## XI.

### Prayer for Relief

Qui Tam Causes of Action

111.  For the foregoing reasons, Relator respectfully requests that judgment be entered in favor of the United States of America and against Defendants for

treble the damages to the United States, in an amount to be determined at trial, the maximum statutory penalty for each false claim submitted in violation of the FCA, an award of costs, and any other relief the Court deems proper.

<u>Employment Claims</u>

112.   For compensatory damages, including back pay, front pay, and other monetary relief, in an amount according to proof, including but not limited to all back pay, including "2 times the amount of back pay" pursuant to 31 U.S.C.A. § 3730(h)(2);

113.   For special damages in an amount according to proof;

114.   For mental and emotional distress damages;

115.   For punitive damages in an amount necessary to make an example of and to punish defendants, and to deter future similar misconduct;

116.   For costs of suit, including attorneys' fees as permitted by law, including those permitted by 31 U.S.C.A. § 3730(h) and California Government Code § 12965(b);

117.   For reinstatement as permitted by law, including reinstatement rights under 31 U.S.C.A. § 3730(h)(2);

118.   For an award of interest, including prejudgment interest, at the legal rate as permitted by law;

119.   For injunctive relief; and

120.   For such other and further relief as the Court deems proper and just under all the circumstances.

///
///
///
///
///
///

# XII.

## **Jury Trial Demanded**

121.  Relator/Plaintiff respectfully demands a trial by jury of all issues so triable.


DATED: October 1, 2019                    Respectfully submitted,


                                          ARENDSEN CANE MOLNAR LLP

                                          _____

                                          HAMILTON E. ARENDSEN
                                          California Bar Number: 212844
                                          550 West C Street, Suite 1150
                                          San Diego, California 92101
                                          Telephone: (619) 535-3910
                                          Email:     harendsen@arendsenlaw.com


                                          THE HANRAHAHN FIRM
                                          COREY P. HANRAHAN
                                          California Bar Number: 256835
                                          402 West Broadway, Suite 1760
                                          San Diego, California 92101
                                          Tel: (619) 377-6522
                                          E-fax: (619) 377-6662

                                          ATTORNEYS FOR RELATOR